CARR *v.* MANISTEE LAND & TIMBER CO.

BROKERS—CONTRACTS—COMMISSIONS.

Where plaintiff, a real estate broker, took from defendant corporation various options to procure a purchaser for a large tract of timber belonging to the defendant, at a specified price per acre and for a time stated, and after interesting a person who did not, however, agree to buy, allowed his option to lapse and the prospective purchaser thereafter bought the property through another, he was not entitled to recover his commissions, the intent of the parties appearing to have been that the broker should have a commission only if he effected a sale.[1]

Error to Mason; Withey, J. Submitted January 21, 1914. (Docket No. 46.) Decided March 26, 1914.

Assumpsit by Arthur P. Carr against the Manistee Land & Timber Co. for broker's commissions. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Robert J. Quail (Frank L. Fowler,* of counsel), for appellant.

*Smurthwaite & Bigelow,* for appellee.

OSTRANDER, J. The declaration in this cause was filed December 3, 1912. It contains the common counts in assumpsit and a special count. The special count sets out, in substance and effect, that the defendant was, in October, 1906, owner of a tract of

_____
[1] Upon the effect of a contract expressly making broker's right to commissions dependent upon "sale" of property or other condition beyond that ordinarily implied, see note in 29 L. R. A. (N. S.) 533.

land containing 12,160 acres, located in the counties of Luce and Mackinac, in this State, and, being desirous of selling the land, it entered into a contract with plaintiff in October, 1906—

"Wherein and whereby the said defendant then and there promised and agreed to and with the said plaintiff that if the said plaintiff would secure a purchaser for said land, that the said defendant would pay him, as commission for securing said purchaser, all that the defendant received on the sale thereof over $15 per acre; that thereafter the net amount that the said defendant was to receive for said land was increased 50 cents per acre for each year, to cover said defendant's increased investment on account of taxes paid thereon, etc.; and that on, to wit, the 14th day of August, 1909, the net price on said land had been increased to $16.50 per acre, and on, to wit, said last-mentioned date it was agreed by the said defendant to and with the said plaintiff that if he secured a purchaser for said land, that it would pay said plaintiff as commission aforesaid all that said defendant received on the sale over $16.50 per acre; that, pursuant to said agreement, the said plaintiff advertised the said land and sought to interest numerous persons in the same, and, among others, the said plaintiff brought the same to the attention of one A. E. Cartier, president of the Cartier Lumber Company, of the city of Ludington, in said county of Mason, and undertook to induce the said A. E. Cartier to purchase the same, either for himself or the said Cartier Lumber Company, and for that purpose on several occasions personally interviewed the said Cartier; that he reported to the said defendant that he had taken the matter up with the said Cartier, and that he expected to get the said Cartier interested in the said land, either for himself or the said Cartier Lumber Company and to be able to induce the said Cartier or the said company to purchase the same, and the said defendant thereupon requested the said plaintiff to make no further effort to sell the same to other persons with whom he had not theretofore taken the matter up, but that he and the said defendant wait upon the action of said Cartier and said Cartier Lumber Company in the matter, and

the said defendant then and there, and on, to wit, the 11th day of June, 1907, promised and agreed to and with the said plaintiff that if any sale of said land was thereafter made to said A. E. Cartier or the Cartier Lumber Company, that it (the said defendant) would protect him in his commission on said sale, according to the terms of the agreement hereinbefore set forth, and would pay him the amount of the commission agreed upon, as hereinabove alleged, the same being the amount that it should receive on the sale of said land exceeding the sum of $16.50 per acre, that being the net price then placed by it upon said land, as per the agreement aforesaid."

It is alleged that on August 14, 1909, defendant sold the lands to the Cartier Lumber Company for $18 an acre, and that thereupon there became due and payable to plaintiff $18,240, which defendant thereafter agreed to pay. At the trial no testimony was introduced upon the part of defendant, but, when plaintiff rested, the court, upon the motion of defendant, directed a verdict for defendant, saying:

"I hold, as a question of law, that under the testimony produced by the plaintiff in this cause, it does not appear that, at the time the lands owned by the defendant in Mackinac and Luce counties, in this State, were sold by the defendant to the Cartier Lumber Company, there were any contract relations existing between the plaintiff and the defendant concerning said land; and that, on the whole testimony produced by the plaintiff in the cause, he is not entitled to recover any verdict or judgment against the defendant."

The bill of exceptions contains all of the testimony, and the principal question is whether it was error to so direct a verdict; in considering which, the testimony for the plaintiff must be viewed in the light most favorable to him. The testimony tends to prove that, having had some talk with T. J. Elton, the secretary of defendant, and learning from him about the

lands and their location, and having been told that it would sell it for $15 per acre net, and protect him in commissions for all he could get more than that, plaintiff told the said secretary that, if he would talk it over with the company and write him to that effect, he would try to get a purchaser. Later he received a letter, dated October 22, 1906, which read as follows:

"Inclosed please find plats of our Upper Peninsula lands; price to you $15.00 per acre and will protect you in all you get over that. And when you get men ready to go on land will give thirty days to look lands and extension if men are on land when time is up, providing there is no option out when you ask for yours. Section 2—44—10 and 35 and 36 45—10 have been burned some before we bought."

After receiving this letter, plaintiff advertised the lands and sought to find a purchaser for them, presenting the matter to several, and, among others, early in 1907 to Mr. A. E. Cartier of Ludington. Mr. Cartier asked him, among other things, whether he had ever seen the lands, and plaintiff replied that he had not. Reporting to Mr. Elton his negotiations with Cartier, Elton suggested that plaintiff look at the lands, and he did go and examine some of them. Plaintiff again saw Mr. Cartier, told him something about his personal visit to, and examination of, the lands, and reported to Elton that the Cartiers were interested, and, he thought, would some day purchase the lands. At different times plaintiff applied for and was given options, once in December, 1906, again in June, 1907. The latter was produced and received in evidence, and reads as follows:

"MANISTEE, MICHIGAN, June 11, 1907.
"This indenture witnesseth: That the Manistee Land and Timber Company of Manistee, Michigan, agrees to and with A. P. Carr of Scottville that it will

at any time prior to July 15th, 1907, at the written request of the said A. P. Carr execute to him or to any other person or persons as he shall direct in writing a good and sufficient deed of lands as per four plats attached hereto in towns 44—10 and 44—11, Mackinac county, and 45—9 and 45—10, Luce county, Michigan, at and for the sum of $200,000.00. Said tract contains 12,160 acres more or less.

"MANISTEE LAND & TIMBER COMPANY,
"By W. H. NUTTELL, President; By T. J. ELTON, Secretary."

Plats of the lands were attached. It appears that this option was given pursuant to a vote of stockholders of defendant, held June 11, 1907; the record of the meeting of stockholders showing the following:

"Special meeting of the stockholders of the Manistee Land & Timber Company was held in the office of the Buckley & Douglas Lumber Company at 8 o'clock p. m., June 11, 1907, for the purpose of considering the matter of giving an option on the companies' land to A. P. Carr of Scottville, Michigan. Upon motion of J. M. Peterson, supported by Peter Friske, the option was given until July 15th, 1907, for two hundred thousand dollars ($200,000.00). The net price to the company to be $15.50 per acre. There being no further business presented on motion the meeting adjourned.

"T. J. ELTON, Secretary."

This meeting was held pursuant to a by-law of the defendant. Under date July 15, 1907, plaintiff wrote defendant as follows:

"T. J. ELTON, Esq.,
        "Manistee, Mich.
"*Dear Sir:*
"I cannot do anything with my Saginaw party at the present time so you might just as well let the other fellow try to close his deal. There are several parties who will be in the market a little later but just now things seem a little quiet. I saw Ross & Wentworth of Bay City. They would like to look at your timber a little later, but just now they are after another

proposition. Will see you in a few days. In the meantime will surrender my claim on the Upper Peninsula lands until the other fellow gets through.
                    "Yours truly,
                            "A. P. CARR."

Plaintiff never applied for or received another option. He talked with Mr. Cartier after the option expired, but never sold the land, and neither Mr. Cartier nor those whom he represented nor any other person ever agreed to buy the land from plaintiff. Mr. Elton at various times inquired of plaintiff about his prospects for securing a purchaser, and wrote him two letters which appear in the record, the first dated January 12, 1907, inquiring what plaintiff had done in that line, the other and last, May 13, 1908, reading:

"What is the outlook? Please keep me posted on what you are doing or expect to do. I have named prices to two other parties."

It further appears that the defendant raised the price of the lands 50 cents per acre per year on account of taxes and interest; the first increase in price being noted in the June, 1907, option given to plaintiff. In August, 1909, defendant conveyed the lands, it is to be inferred because of a sale effected by a Mr. Seymour for $18 per acre. Plaintiff testified, in part, as follows:

"Before I received the letter of October 22, 1906, I had had a conversation with Mr. Elton two or three times and the letter is in line with the conversation as far as our dealing was concerned. The defendant company was to have a fixed price of $15 per acre net to them, and what I received over and above that figure was my commission. If at any time I had a purchaser who desired to examine the land, they would give me an option for sufficient time to examine the land if no other option was out at the time, and, if the purchaser was on the land at the expiration of the option, they would extend the time, so as to enable the purchaser to finish his examination. That was

my bargain with the defendant. I called for options as I wanted them. The first option I had was in December, 1906, and I think it was for thirty (30) days, but am not sure whether it was for thirty (30) or sixty (60) days. I don't know where that option or contract is now. I was unable to find it. It is mislaid somewhere, but I did have it in my possession. It expired without my having made a sale. 1 didn't give up the work on that account, but continued my efforts. I afterward went for another option. That was about the same time that I was up there attending that meeting.

"*Q.* Now, Mr. Carr, didn't Mr. Elton tell you on that occasion that to make any arrangements for the sale of the land would require the action of the stockholders, and they would have a meeting that night to pass upon your option?

"*A.* He did not.

"*Q.* Now, as a matter of fact, while you was there the meeting of stockholders did vote another option, didn't they?

"*A.* I don't think it was submitted to vote. It was talked over and agreed to by the members. They consented to the option being given, and then I received an option which has been introduced in evidence here.

"*Q.* At this time you stated that the company had advanced the price because the taxes having been paid, and the interest on the principal running.

"*A.* Yes, sir; I think they had at that time, and I think that the option was for $200,000. I would have whatever I could sell the lands for, more than $200,000. I continued my efforts while this option existed, while it was in force, and it expired according to its terms on the 15th day of July, 1907.

"*Q.* Now, Mr. Carr, you say you did not cease efforts after that option expired?

"*A.* No, sir.

"*Q.* You still continued looking for purchasers for the lands, did you?

"*A.* Not outside of the Cartier Lumber Company. I didn't look any more, but I still continued to look for them.

"*Q.* And you knew that according to a written agreement that the company at any time you called for an option, when you had a purchaser, the company

would give you an option for a short time to look the land over?

"*A.* That was the arrangement.

"*Q.* Did you ever call for another option after this one expired?

"*A.* I don't think I did.

"*Q.* Then this is the last option that you ever asked for or received?

"*A.* I think it is.

"*Q.* Did you know of their having given an option to other people in the same time.

"*A.* I did on one occasion.

"*Q.* What party was that?

"*A.* I think it was Nessen & Dovel.  Mr. Elton told me.

"*Q.* Then you knew that part of the time after this option expired at least one other party held an option on this land and examined them?

"*A.* Yes, sir.  *   *   *   I talked with Mr. Cartier after this option expired, but never sold it to them, and they never agreed to buy it from me.  The first talk I had was before I had the option and was with A. E. Cartier, and twice I talked with Warren Cartier, once at the log slide at their mill, and once at the Cartier Lumber Company's office at Ludington.  That talk was some time during 1907.  I told him that I had this land for sale, and A. E. Cartier asked me if I had seen the lands myself, and he did not say these lands had been presented to him before and had been turned down by them.  There was no change made in our arrangements at that time other than that I was to go and look at the lands; there was never any change made in our arrangements, no more than that they raised the price on me from the original price.  I talked with Mr. Elton about the price several times.  He told me that additions were made to the price because of their having continued to pay taxes, and that the interest on the money was running on the investment.  The last price he named to me was $16.50 per acre.  I made different offers on different occasions; as the price advanced to me, I advanced it to my customers.  Mr. Cartier was not contemplating a purchase of these lands individually in his talk with me.  I do not remember any conversation that he would try and interest some parties in the lands,

and, if they would join him, he would 'purchase them. He had our plats at one time, and returned them to me. Mr. Cartier wrote me a letter, but I could not say the contents of it now; I know he returned me the plats, and said he did not want to delay me in any sale with other parties, and that he could not take the lands at that time. I knew the lands were for sale during all this time. The defendant company asked me what my prospect was to secure a purchaser. At one time I ceased operations awhile and another party had an option. I ceased just during the time these other parties had the option; then Mr. Elton told me I could go ahead again. On October 27, 1909, I learned through Mr. Elton that the lands had been sold. I was at his office at the Buckley & Douglas Company in Manistee on that day. I had heard of the sale before. I never knew that Mr. Seymour had applied for or had an option to sell the lands in question, and did not know they were sold until October 27, 1909, as above stated. Mr. Elton stated that the sale was to the Cartier Lumber Company, who was a customer of mine. When I made a price to the Cartier Lumber Company, they agreed to examine the lands later on and determine, after examining them, whether or not they would take them. They never offered to take them at the price I named. * * * At several times the defendant company gave me 30-day options, which I thought I could use at that time. In December, 1906, I think they gave me a 30-day option, and they gave me another option in June, 1907. They were given because it was hard to interest a customer unless you know what you are talking about. You have to have something specific. It was understood between the company and myself that I should have these options at any time when I had a customer interested. I have mislaid the December, 1906, option."

Without going further, it seems to be clear that defendant did not list its lands with plaintiff for sale, with the usual resulting agreement that, if plaintiff procured a purchaser willing and able to buy them, he should be paid a commission. On the contrary, defendant offered the lands to plaintiff first at $15 an

acre, promising him an option when he was ready for it, if no other option was outstanding. Months later, defendant offered plaintiff the land for $15.50 an acre, but by the resolution of the stockholders and by the terms of the writing given to plaintiff pursuant to the resolution the offer expired July 15, 1907. The purpose of defendant to limit the authority of plaintiff, and to protect itself from precisely such a demand as the plaintiff is now making, is apparent. But plaintiff also testified, and it seems that upon this portion of the testimony he most relies, that he was present at the meeting in June, 1907, when an option, already herein set out, was given to him, and that at that meeting an oral arrangement was made. He says:

"I went over there at that time and found Mr. Elton, Mr. Peterson, Mr. Nuttell, and another gentleman that I didn't know. Mr. Elton asked me to tell the gentlemen what I had done relative to the sale of this particular land in the Upper Peninsula. I told them the different parties that I had negotiations with, which I have related already, and I made special reference to Mr. Cartier and Cartier Lumber Company. I told them that the Cartier Lumber Company were interested in this timber; and that it was a question whether they would buy just at this time on account of the money market; that they told me they preferred to wait awhile before they made a purchase, but that they were interested in it, and I felt confident that they would close with them in time if we worked them easy. There was a response made to this report. I think Mr. Nuttell said something about the deal; I can't relate just what was said. It was something on the line that they objected to me peddling this tract of timber around that way among so many different companies, and they requested me to confine my efforts to making the sale to the Cartier Lumber Company. I think it was Mr. Nuttell that said that. I don't think that I made any reply at that time. Mr. Elton said to the people that he would very much like to see me close the deal, on account of the work that

I had done on it. And he asked them if they would be satisfied; that is, he asked those other gentlemen that I have mentioned—Mr. Peterson, Mr. Nuttell, and I don't know who the other one was, but he was supposed to be a member of the company—if they would have any objection to me going on and trying to make a sale to the Cartier Lumber Company. After some talk they said that they would not. Some one of them there, Peterson or Nuttell, I could not say which one of them there at this time, said that if I would confine my efforts to the Cartiers, they would not have any objections. Mr. Elton also said the same thing in their presence, that that was the sense of the company. Mr. Elton said, with reference to a commission, in case I made a deal with the Cartier Lumber Company, to go on and work on the Cartiers, and they would protect me in a commission. That was said by him in the course of the meeting that was in case of a sale with Cartiers. I cannot state what time this meeting was held; it was in June, 1907, I think. After this I continued negotiations with A. E. Cartier and Warren Cartier, more particularly with the old gentleman, A. E. Cartier. A number of times —ever so many times—I cannot enumerate the times I talked with him about the deal, covering probably a year and a half. I knew of the Cartier Lumber Company looking this land in the early part of 1909. I talked to Mr. Cartier after they had looked the land. I spoke to Warren Cartier about it after that. From the time I attended this meeting in Manistee in 1907 up until the time the Cartiers looked the land I reported to Mr. Elton as to what I was doing about it once or twice a week; a part of the time, sometimes there would be two or three weeks that I would not see him, but every time I had anything I considered would be of any interest to him I reported it to him. I nearly always went over there and talked with him at Manistee. Sometimes I talked with him over the phone. Mr. Elton called me a great many times over the phone at Scottville."

In view of the fact that plaintiff took away from this meeting a written option which expired in about a month, that he was then seeking to sell the lands to persons other than the Cartiers, as his letter of July

15, 1907, surrendering the option, indicates, and that after the meeting he did not confine himself to attempting to sell the lands to the Cartiers, one may reasonably conclude that, whatever conversation plaintiff had with individual stockholders, no one, neither plaintiff nor any stockholder of defendant, understood that an arrangement such as is set up in the declaration was then and there made. If there was any such general arrangement made, the voting of an option expiring July 15, 1907, was a curious and unexplained performance. An analysis of all of the testimony leads to the conclusion that it was understood that, unless plaintiff actually made a sale of the lands, he should be paid nothing.

This conclusion requires an affirmance of the judgment.

McALVAY, C. J., and BROOKE, KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.